UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J. CARDENAS & SONS FARMING, INC., JUAN CARDENAS & GRACIELA CARDENAS AND RIO VISTA CORPORATION, JUAN CARDENAS & GRACIELA CARDENAS, | ) | |
| Plaintiffs, | ) | Docket Nos.: 07-350T<br>07-351T |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 57

Place: Washington, D.C.

Date: May 5, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J. CARDENAS & SONS FARMING, INC., JUAN CARDENAS & GRACIELA CARDENAS AND RIO VISTA CORPORATION, JUAN CARDENAS & GRACIELA CARDENAS, | ) | |
| Plaintiffs, | ) | Docket Nos.: 07-350T 07-351T |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom 7, Room 508
National Courts Building
717 Madison Place NW
Washington, D.C.

Monday,
May 5, 2008

The parties met, pursuant to notice of the Court, at 3:05 p.m.

BEFORE: HONORABLE CHRISTINE ODELL COOK MILLER
Judge

APPEARANCES:

For the Plaintiffs: (Via Telephone)

MARTIN A. SCHAINBAUM, Esquire
Martin A. Schainbaum, PLC
351 California Street, Suite 800
San Francisco, California 94104
(415) 770-1040

APPEARANCES: (Cont'd)

For the Defendant:

JENNIFER D. SPRIGGS, Esquire
U.S. Department of Justice
555 4th Street, N.W., Room 8116
P.O. Box 26
Washington, D.C. 20044
(202) 307-0840

P R O C E E D I N G S

(3:05 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Christine Odell Cook Miller presiding.

Calling the consolidated cases of J. Cardenas and Sons Farming, Inc., Docket No. 07-350, and Rio Vista Corp., Inc., v. United States, Docket No. 07-351, for oral argument on Defendant's motion to dismiss.

THE COURT: Good afternoon, Ms. Spriggs, how are you?

MS. SPRIGGS: Good afternoon, Your Honor.

MR. SCHAINBAUM: Good afternoon, Your Honor. This is Martin A. Schainbaum in San Francisco. Thank you for allowing me to participate by telephone.

THE COURT: Our pleasure. In this particular case, where we're following along the dotted line, it may be more difficult, but we'll do our best. So if you don't understand a document to which we're referring, Mr. Schainbaum, please let me know.

MR. SCHAINBAUM: All right. And Your Honor, I am anticipating going to the ADA Tax Section meeting, and I should be in Washington Wednesday night

or Thursday. So if there's some additional proceeding that you would like to have on Thursday, I will, in fact, be in Washington.

THE COURT: Well, this might be very useful, because one of the things that may develop out of our proceeding today is that you and Ms. Spriggs get together to see exactly what you can agree on with respect to which payments were made and applied to which deficiencies, and whether we have any tax years that were fully paid up.

MR. SCHAINBAUM: Right. And Your Honor, we have asked Mr. Gustafson and Ms. Spriggs to have a meeting on Thursday. We sent a letter in March. And Mr. Gustafson was kind enough and gracious enough to consent to have a meeting at I believe 10:30 on Thursday morning, in the Department of Justice, to sort out just exactly, among other things, what you are --

THE COURT: Well, I'm delighted to hear that. We'll determine what else you may discuss, and the Court will be available. Ms. Resnick, my law clerk, who is assigned to this matter, and I will be unavailable tomorrow, and Wednesday we'll be in North Carolina on a settlement.

We will be here on Thursday. And if during

that time your discussions get to the point where you might want off-the-record comments by the Court on any matter, all you need to do is call Ms. Resnick.

I would be pleased to meet with both of you if it advances that far, but I trust if you're meeting with Ms. Spriggs and Mr. Gustafson, they will be taking whatever steps are reasonable in light of today's proceeding to resolve what may be, in my mind at least, some factual issues that the parties' briefs haven't addressed.

Let me ask you first, Mr. Schainbaum. You submitted one thing that was very helpful, and that's the installment agreement that purports to cover all tax years up to September 30, 2005, in terms of the agreement itself, Form 433-D.

Now, our subject payments in this case were all dated in 2006. Is there a subsequent agreement that covers the disposition of those payments?

MR. SCHAINBAUM: Your Honor, we have been unable to find any further installment agreement. It appears from the evidence that we have accumulated, and what you have in the form of a schedule, that $8,000 monthly payments have been made consistently from 9/23/04; 8/26/04 was $10,000, and so was -- after that, at 10/28/04 right through to 2/27/08 there

appears to have been $8,000 payments, based upon this initial installment agreement.

We have nothing further than that, Your Honor.

THE COURT: Okay. Now, we've only been talking until we got your subsequent materials about these four particular checks, and the following occurred to me when I received especially Plaintiffs' subsequent materials that reflected a continuing, ongoing installment agreement.

The first thought I had is, if you don't have an installment agreement covering the subsequent payments and they have been continuing, as Plaintiffs represent, whether we can assume that the payments would be applied to the oldest periods first, until such time as the payments paid off all due balances, and then were applied, rolled over so to speak, to take care of subsequent years in suit.

And in that case, what we're looking at now is, in anything subsequent to 1998, which is the oldest tax year for which the government does not dispute a timely filing for Cardenas & Sons, and for 1996 and 2003 I guess for Rio Vista.

1998 I should say is not -- I've gotten that reversed, I'm sorry. I was looking at the wrong list.

The government does not contest 1993, '95, '98 for Cardenas & Sons, and Rio Vista 1996 and 2003. I was looking at my wrong line. But we are in dispute as to 1997, 1999, 2001, 2002 for Rio Vista, and for Cardenas & Sons and Rio Vista, let's see -- no, I've got it here. Sorry, 2000 is Cardenas & Sons. Now I'm looking at the right line. And 1997, '99, 2001, 2002 for Rio Vista.

Now that I am on my own page and have the correct notations -- I think my chart may have been less informative than any of yours -- let me state that again so I'm not too confusing.

If we assume that money was applied to the oldest tax year for Rio Vista, we know that that is, all this tax year we have here is 1996, to which the government does not agree. Does not disagree.

So we have 1997 being the first year the government disputes, and the first year that would be subject, assuming all previous years in 1996 had been paid up, to have the deficiencies apply, deficiency payment apply.

And for Cardenas & Sons, the year 2000 is the first the government disputes. And the oldest one listed prior to that was 1998. So what that suggests to me is that the records should reveal that if

payments were made with these 2006 four checks, each in the amount of $8,000, that they would have been applied to the oldest Cardenas year first, and the oldest Rio Vista year first, and moving up in time, especially with respect to Rio Vista, to 2001/2002.

Now, the difficulty I'm having conceptually with this case is that until I received the supplemental materials, I thought we were just talking about four checks. It appears that payments have been made consistently. If that's the case, wouldn't -- and assuming that the payments had been applied to the oldest years first in which there was a balance, and if they had been made consistently up to date, wouldn't that render the claim for all these tax years current? Can you speak to that, Ms. Spriggs? Meaning that you have to sue within two years of the last payment.

MS. SPRIGGS: Two years of the last payment for the tax period. So for Cardenas & Sons for the year 2000, you would have to look at the account for that year to see when the last payment was made for that year.

THE COURT: Well, I found the chart you submitted in request to my order, which was singularly unhelpful. But what was helpful was the certificate

of official record, meaning the Form 430 certificate of assessment for '98, and then Plaintiff had one for '95.

MS. SPRIGGS: But Your Honor, the chart that we submitted, it was, we don't have that information because we don't have the charts.

What we do have is a certificate of assessments and payments which shows us when the last payments were made for each tax year.

THE COURT: Okay. Now, the only thing is we looked at what Plaintiffs submitted in opposition at pages E-40, 41, and E-48, and I guess that would be 49 through 52. These certificate of assessments, excuse me, I mean these records are dated, the first one, Exhibit C, is dated September 6, 2007. And it covers the period ending December 31, 1995. And it shows the May payment of our four payments.

And then when we go to Exhibit G, for September 6, 2007, the record reveals the other three payments, the two, the February 22, '06, payment of $8,000, and the March 21 one in the amount of $7,966 on page E-51. And on E-52 we have the April 24, 2006, payment of $8,000.

So these are the best records we have from the government, not so much the chart you just

submitted. And of concern is where were these payments applied? If they were applied in the spirit of the prior installment agreement, they would have been applied to the oldest accounts with balances of either Cardenas & Sons or Rio Vista. And what I can't tell from these documents is to what they were applied.

MS. SPRIGGS: Well, they were, they were applied to the, the payments that you see on the transcript for the 1995 tax year were applied to the employment tax liability for 1995.

Now, and the, for Exhibit D, that's the certificate of assessment and payment for, that's for J. Cardenas & Sons Farming, Inc., their employer's annual tax return for the 1998 tax year.

THE COURT: Right.

MS. SPRIGGS: So the payments were applied to that corporate entity's employment tax liability for 1998.

THE COURT: Okay. So you're saying that these four payments went to dates that the government doesn't challenge, one of which is not a tax year even in issue. 1995 is in issue, 1998 is in issue, but not in issue on Defendant's motion.

Rather, you're saying that there have been,

that the complaint was filed more than two years after the last payment for Cardenas & Sons for tax year 2000, and for Rio Vista, '97, '99, 2001, 2002. And the records that were submitted with Plaintiffs' motion only involve J. Cardenas & Sons for those '95 and '98 tax years. That's what you're saying?

MS. SPRIGGS: Exactly. And also, for Rio Vista we do have the 1993 year as part of the --

THE COURT: Where is that?

MS. SPRIGGS: -- motion to dismiss.

MS. SPRIGGS: That was a failure --

THE COURT: No, that's the abatement question.

MS. SPRIGGS: Yes.

THE COURT: I wanted to save that, if you don't mind.

MS. SPRIGGS: Okay.

THE COURT: But if we could just speak to the tax years. Now, until we received the recent sheets from Plaintiff, I really thought this case was about four payments of $8,000, one of them slightly less; three payments of $8,000, one slightly less. And the issue would have been whether Defendant applied two accounts with balances in them at the time those payments, as they came in.

And it's Defendant's position that there were outstanding balances at the time to which these $8,000 payments were applied, so that they were correctly applied to the latest tax year -- the oldest, I should say, tax years in issue with a balance?

MS. SPRIGGS: Well, Your Honor, I'm not sure that they had to be applied to the oldest tax years. Because we, I haven't received any information confirming that this installment agreement that taxpayer submitted was the actual agreement that was in effect. There's interlineation, there are notations on it that my contacts with the IRS were not familiar with.

And they were concerned because this document isn't signed. And they also --

THE COURT: Well, it's signed by the Cardenases, but you're saying not by anybody from the IRS?

MS. SPRIGGS: Yes, not by anyone at the IRS.

THE COURT: Would the IRS normally have a copy of an installment agreement that was signed for a taxpayer when the IRS is receiving installment payments over a multi-year period like this?

MS. SPRIGGS: I would imagine that they do

have a copy somewhere.

THE COURT: Well, I mean, they should have a file and a copy, some, you know -- somebody is responsible for keeping this documentation. And as you know, the law favors the government in terms of saying that its certificate of assessments and payments is presumptively correct.

But if there is an installment agreement agreed that Plaintiffs have to produce it, but if Plaintiffs produce one that isn't signed that covers the relevant period, I'd say the ball is in your court to show me the counterpart.

But we're not talking about an agreement in the relevant period. Plaintiffs don't have that yet. Mr. Schainbaum says the Plaintiffs haven't been able to locate it. Is that correct?

MR. SCHAINBAUM: The only installment agreement, Your Honor, that we have is the one that you have, that we submitted.

THE COURT: Right. So what Plaintiffs are saying, Ms. Spriggs, is that they don't have an agreement for the subsequent period, but they were making payments pursuant to this agreement. And the payments were accepted by the IRS.

And so the concern would be whether the IRS

duly applied them to accounts with a balance in them, whether or not they were the oldest first. That would be the first issue.

MS. SPRIGGS: Well, I guess the question that has come up is, it appears that this agreement, it was a 10-month installment agreement. The payments, it was to full pay, was to be full-paid 9/30, 2005.

And after that point, I guess, the Service's position is this is ineffective, the agreement was ineffective, because there was no --

THE COURT: Even if it was ineffective, and even if the Service didn't seize any property, the Service has been receiving checks subsequent to that, up until the present.

And so the question I would have is, if the government has been receiving these checks in the amount of $8,000 on a monthly basis consistently, wouldn't it be useful, when Mr. Schainbaum meets with you and Mr. Gustafson, to go over the IRS balances for each of the two accounts to see how these checks were applied?

Because to the extent Plaintiff hasn't, Plaintiff is going to produce canceled checks for you. To the extent that they weren't submitted with

Plaintiffs' appendix.

Mr. Schainbaum, I was concentrating on it was four checks. Did you submit -- I noticed you have canceled checks attached for later periods. Did you attach all of them?

MR. SCHAINBAUM: Yes. We have submitted checks, front and back. And that raises a subsequent issue.

The backs of the checks clearly show that the U.S. Treasury received the funds, because it says "credited U.S. Treasury." And we have extracted the dates of when they received it.

Now, having been a former Assistant U.S. Attorney in the Tax Division representing the Service for over 10 years, and before that as a trial lawyer for the IRS, there are many times I have stood up in Court with a nice blue ribbon and a gold seal on these certificate of assessments, and they haven't been correct.

Now, the real question here is what happened to the accounting for all of these checks that total $368,629? Whatever the transcript shows, there is a complete non-accounting of lots of $8,000 checks that the Service received, did not reject, and accepted.

So we submitted to you, Your Honor, the

universe of the checks. Am I right? And not only did we do that, but we also did the back. And I have to apologize in the sense that the usual, the U.S. Treasury, when they negotiate those checks, sometimes scrambles it in such a manner it's hard to decipher. But I was able to decipher that they were credited to the U.S. Treasury. And after looking at the four subject checks, I was able to extract the dates.

So wherever the payments went -- early, late, in the middle -- the transcripts fail to account for all these checks.

THE COURT: That's of concern. Ms. Spriggs?

MS. SPRIGGS: Your Honor, we will, definitely we're looking at the checks. We are going through them and trying to track down where they are.

I think at the end of the day, we will be able to account for all the checks. And that's sort of a side, perhaps a side issue from whether the claims for refund were filed within two years of the payment.

Part of the problem that we have found, we've noticed so far in looking at the checks, is that there are liabilities other than employment tax liability, liabilities other than the Form 923. So there are, there's an unemployment tax liability, Form

940 liability. There's corporate income tax liability.

So where exactly the payments went, we can track it down. Probably it will take some time. Some of the backs of the checks are very difficult to read. But it is coded on the back of the check, and we've clearly been able to see on some of the checks that they were credited to a 940 unemployment account, rather than the 943.

MR. SCHAINBAUM: Well, Your Honor, 940 is an employment tax; 943 is employment tax for farmers.

Cardenas & Sons and Rio Vista are significant, substantial farmers in the Santa Maria area. Everyone here may have had their product. They produce the strawberries, the large ones, that you have. And I think that they were so fearful that they would have their assets seized, they kept paying consistently $8,000.

And that's the essential problem in this case, is the accounting by the IRS. Because originally you have a case that arose, money was paid at the end of the quarter to Wells Fargo Bank as the agents of the Treasury. Some subagent or clerk within that Wells Fargo Bank helped the bookkeeper disseminate the checks to a private account.

I can categorically tell you and represent to you that the refund claims were filed within two years of payment. There is no real issue, if you address it. The issue becomes the accounting for all of these checks. And the Service, and the Santa Maria office is a little bit different than what you're used to all across the country.

And so I'm saying that there may never be a real accounting of all these checks. I hope there is, and I'll do everything in my power to assist the Service, such as we've gotten the front and back of the checks.

But the real problem here is the accounting of the money. This is a straw issue, or smoke.

THE COURT: Let me ask you this. As you know, Mr. Schainbaum, I can't accept your representation that, you know, the claims were filed within two years of the last payment, although we'll rectify that issue. Agreed, we'll definitely rectify it.

But are you saying that there's a notation that they were credited to the wrong account? There is no liability under 940, as opposed to 943? I didn't quite get that.

MR. SCHAINBAUM: I'm not saying that, Your

Honor. I'm saying that, that the real problem here is, and I hope we can sort it out with Mr. Gustafson and Ms. Spriggs when we sit down, is the accounting for the $8,000 that's been consistently paid, that we say total $368,629.10. We feel there's no tax due and owing. There may be a slight refund. If anything is at issue here, it's the penalties. And that's a legal issue to be determined on objective, reasonable cause why the penalties shouldn't be imposed.

So the issue for all of us is to sit down and work together, and figure out where all these $8,000 payments went. Because the transcripts are short on accounting for all of them. And I think it's working together, we should be able to solve it. Because the checks, whether you can read them clearly or have a hard time, reflect that they've been through the Treasury.

And so if we work together, we should be able to solve this. And the Court should, you know, have minimal involvement.

THE COURT: Well, I certainly am failing in reading my own chart, even though my own intern prepared a very helpful chart for me based on when we thought life was simple and we were dealing with only tracing down the $8,000 payments for four checks.

But I would make this observation. Whatever liabilities to which they were applied, Defendant has suggested that as long as there are deficiencies, the IRS can apply them, monies incoming, as it sees fit.

It would seem to me that we know from the face of the checks, these are J. Cardenas & Sons. And therefore, it would seem that the liability would be J. Cardenas, and to the extent there was a deficiency, Rio Vista.

Now, when I say to the extent there was a deficiency, that means that we've covered J. Cardenas after 2005, when the September agreement expired.

I do think that if Plaintiff has been making payments, noting on the memo, on the agreed-upon installment agreement, that the IRS through Defendant should make best efforts to see that the accounting applied them accordingly, which means although they come on J. Cardenas & Sons' account, they would apply in equal measure to Rio Vista.

I'm not suggesting the government is legally estopped; that's beyond my bailiwick. But I am suggesting that if, for a period of a number of years the IRS kept receiving these $8,000 checks and applied them to J. Cardenas per the installment agreement; and then now I'm looking, I've got some Rio Vista

Corporation checks, so I could say the same thing, at least two Rio Vista checks; that if they were applied to Rio Vista, it would suggest to me that the IRS was choosing to continue on its own application of the installment agreement. So that we could expect that the checks would have been applied to all accounts, from the oldest to the most recent, in which there was a liability.

I only see two from Rio Vista. But again, if they were applied in that manner, it would suggest that that's how these checks should have been applied.

So I'm hoping the parties can focus on the application of the checks to deficiencies related to these two corporations. That avoids having to get into the legal effect, if any, of Plaintiffs continuing to make installment payments pursuant to an agreement that has expired. That's a matter, rather than briefing, I think it would be in the parties' interest to resolve.

Defendant does make one point that I think we can agree upon. That is that to the extent that we're talking about individual personal liability of the couple, Juan and Graciela Cardenas, under the responsibility statute, that's a separate matter. And these checks don't apply to that. And that the claim

was filed prematurely, in advance of the six-month expiration for the Commissioner to act.

I'm not going to enter a ruling on any of these claims now, but I don't think that that matter should be in dispute.

I also think to the extent the parties can show that there was an abatement for the 1993 period of Rio Vista, that that matter should be in further dispute. And again, if you get together and go over all the records, I'm sure that you will bring Rio Vista up to date, starting with 1993, and see if, in fact, that year does reflect an abatement.

At some point the IRS has got to have records that are entitled to the presumption of correctness. To the extent that records don't exist, I will have to take a statement from Defendant that they don't on the record. And then we default to Plaintiffs' records. And if we have to default to Plaintiffs' records, then Plaintiffs' scenario in terms of what's shown will carry the day if the documents are properly authenticated and otherwise admissible, such as canceled checks.

I think from what Ms. Spriggs says, that Ms. Spriggs is going to need more time than two days to track this matter down with the IRS. If that's the

case, when you meet with Mr. Schainbaum on Thursday, is it possible you could at least agree on a framework for how to approach this, Ms. Spriggs?

MS. SPRIGGS: Yes, Your Honor.

THE COURT: I would be most grateful if the parties took this out of my hands, because every time I get more information I realize that we just don't have the underpinnings to which to assign it. I mean, what Plaintiff has submitted is extremely helpful. We didn't understand how it fit into the $4,000, except, as my law clerk who is working on this pointed out, if in fact there had been payments, and they have been applied to satisfy older liabilities, and then successively to more recent ones, that might take care of the statute problems with respect to the problem years for Rio Vista. Perhaps Cardenas, as well.

But I do not have any idea as to the balances to which they were applied for any of the years. So I'm not in that position to comment.

MS. SPRIGGS: Well, a couple of points, comments that I have about the spreadsheet from Mr. Schainbaum is that it includes payments, well, it includes checks that were, or payments that were after the timeframe of the claim for refund itself. So there is a whole series of payments in '07 which are

subsequent to the claim for refund. So I don't know why those are relevant.

THE COURT: Mr. Schainbaum?

MR. SCHAINBAUM: Your Honor, the relevancy of those checks is to show the complete universe, and how the checks were paid into the Internal Revenue Service; how the Service accounted for them.

The relevant checks of those four checks, I think there have been subsequent refund claims filed. I'm not sure, I'll have to check with the CPA. But that my position for the Plaintiff is if you total all the checks up that are going to the U.S. Treasury, there should be no tax due and owing on any period. In fact, there might be a slight refund. And the only issue would be the penalties. And that is the subject of the standard or objective reasonable cause.

And I think you're right, Your Honor. You shouldn't be burdened with this. The burden should be with the parties. The burden should be with the Service now to account for all of these checks, and pay them. Because contemporaneously, each of the tax periods that are contemporaneous are self-funded. That all these payments relate to earlier time periods.

And we sued on the four checks because we

weren't able to get any satisfaction out of the Service. And perhaps with the help of the Department of Justice and all working together, we can come to a fair resolution here, you know. If there's tax owed, then there's tax owed. If there isn't any, and there is some refund, then fine.

But I say that all these $8,000 payments, up to and including contemporaneous payments, relate to earlier periods, which may have thrown the whole account into an overpayment situation. But I can't tell because we need the help of the Department and the Service to sit down and sort through.

I don't have any confidence in the transcripts. Because, prima facie, they don't account for some of these checks. And to that extent, they are relevant to show that there's a presumption, if it ever existed, for those certificate of assessment payments are an advantage, I think the Court correctly analyzed that the burden now shifts to the Service because we have presented prima facie evidence, credible evidence of the checks, front and back, showing codes for U.S. Treasury credit.

And it's really more or less an accounting problem, rather than some great legal issue. Because all of these checks, the four of them, if you look at

the back of them, were negotiated within two years of the refund claim. And the lawsuit was started I believe within the year of the refund claim, because the Service didn't act on it. That's my position.

THE COURT: What I'd like to do, I think that the motion to dismiss has to be reassessed in light of a proper accounting. And by proper, I mean one that's entitled to a presumption.

Right now I have no way of knowing whether these post-2006 checks relate to earlier liabilities and tax years involved in the suit, which will be resolved when the parties get together and accomplish their accounting. So the fact that they post-date the filing of the claim is not dispositive.

But I would say that what I would like to have happen is to treat Defendant's motion as provisionally withdrawn. And then if, after this investigation and accounting, the government believes that it's still appropriate to so advise me, and will focus only on those portions that the government thinks it's still appropriate on.

But Ms. Spriggs, even though you'll have the time you need to work with the Treasury, you know, we've gotten this far in the case. And usually we have everything the IRS knows about a case in the

extended period for answer.

But you know, here we moved ahead. And so perhaps the Service is learning as much as we are as we move along because of the motion to dismiss.

But I would say that, based on the records I've seen, that they really do not capture what we need to have captured here. Even in terms of the installment agreement that is expired, I do not see the application of payments pursuant to that agreement.

And my suggestion, and of course the government only needs to take it as a suggestion, is that if the government has indeed been receiving $8,000 installment payments subsequent to September 2005, that they should be applied to liabilities of the two corporations. And hopefully these liabilities relate to something that is germane to our claims, so that they're either timely, or if there are still deficiencies, they are not timely, given the last date of payment.

The problem is if all these payments have been applied to past claims, unless the deficiency is much greater than I've been led to believe, it would appear the Plaintiff has made timely refund claims, or filed suit in a timely fashion, because these later

payments would have hit later years. And until we know that, we won't know if the claim is timely.

I understand what Ms. Spriggs is saying. She's saying you can't bring suit on a claim that's time-barred, and then cure the problem later by making a payment.

But I think our main interest in this case is to make sure that the Treasury is whole, and that we sort out the issue of penalties. I don't hear a loud cry from Plaintiffs concerning liability. So if our issue is really to make sure that the tax due and owing is paid, and that we proceed to adjudicate any penalties, I think we can refocus the case so that Defendant can report whether any of these claim years are eligible for consideration on the merits, and not jurisdictionally defective.

MR. SCHAINBAUM: Your Honor, one observation. If you look at some of the transcripts, and I can't put my finger on it now, the transcripts themselves indicate that some of the assessments are time-barred. And the question arises, if a payment was made in 2006, and the assessment is otherwise time-barred, why is the Service then going back and crediting those years?

I mean, that's some of the issues that we're

going to have to sit down on Thursday and sort out.

THE COURT: I don't think these transcripts tell me that on the face. I hope you can pull that out for your discussion.

MR. SCHAINBAUM: Right. I think, if you'd just give me a moment, I'll have my associate look at -- because we did notice there was some legend on one of the transcripts which further troubles me as to the integrity or the confidence in the transcripts.

Rio Vista 1996 is part of -- is it here?

THE COURT: Which page of your appendix is that?

MS. SPRIGGS: That's not one of the years I moved to dismiss.

MR. SCHAINBAUM: No, okay. All right.

THE COURT: 1996 and 2003 for Rio Vista are not subject to the motion. That was what I started reading in reverse. And nor are 1993, '95, and '98, for Cardenas.

MR. SCHAINBAUM: Okay.

THE COURT: So we know the issue for 1993 in Rio Vista is abatement, and we have a premature issue with respect to the penalty for Juan and Graciela Cardenas.

MR. SCHAINBAUM: Right.

THE COURT: And I think those issues we can put aside for the moment.

MR. SCHAINBAUM: Okay.

THE COURT: And the, but what the parties should be concentrating on are the 2000 year for Cardenas & Sons, and for Rio Vista, '97, '99, 2001, and 2002.

MS. SPRIGGS: Your Honor, an observation also that I would have is that, and for Mr. Schainbaum, when we do have our meeting on Thursday, is that there are balances due and owing on the Rio Vista account for 1999, 2001, and 2002. Those are still due and owing as accounts that have not been fully, fully paid.

MR. SCHAINBAUM: Well, Your Honor, I'm not going to have any ability at the moment to comment because of the discussion this afternoon, that the transcripts cannot be reconciled with the checks paid.

What I will say is if there is any tax due and owing, and it can be shown by, after the credits of all those $8,000 checks, then so be it, it will get paid. As you said, Your Honor, we'll make the Treasury whole.

As to the penalties, I resist and dispute that because of the way this came down. But as to

making the Treasury whole, I'm in accord with the Court.

THE COURT: I think that's quite a concession, Mr. Schainbaum, and I thank Plaintiffs for it.

I will say this, Ms. Spriggs. To the extent that the parties can resolve this matter between themselves, I would suggest it. Because when the issue of penalties comes in, it turns, of course, on judging Plaintiffs' conduct. But from my own experience with several penalties cases, one of which involves you and the one I just tried, Plaintiffs are held to a standard of reasonable cooperation with the IRS. And that is a very important factor in the imposition of certain of the penalties.

But this may be a case where if the IRS's record-keeping is represented by anything like the supplemental filing that you were given, and that you made on behalf of your client, which is then a reflection on you, it's a reflection on the client, the IRS is going to be held to the same level. Because there really should be no dispute about what was paid and recorded. And we're now tripping over ourselves with $8,000 payments.

So I hope you're gaining the highest level

of cooperation from the IRS regional office, because it owes it to you, because it has to manifest this in terms of its cooperation in the proceeding. If Plaintiffs are going to be held to that level of cooperation with the IRS, and all the IRS is required to do is to maintain records that are up to normal bookkeeping standards, and be able to account for payments of, you know, significant sums that are made serially with respect to these two corporations.

What I'd like to do -- this may be premature, Ms. Spriggs, but I need to get from you a time estimate when you think you might be able to report on the parties' efforts to reconcile the tax payments.

MS. SPRIGGS: Well, I guess I need to understand from Mr. Schainbaum what he is exactly contesting. Because when I looked at his schedule, he's showing where the checks were credited. And so he is saying, I understood him to be saying that this is where the checks actually show up on transfers of account, and they were given credit.

My understanding was he just was unhappy with the allocation of the credits, not that they weren't given credits.

Am I understanding you, Mr. Schainbaum?

MR. SCHAINBAUM: I don't believe you have a clear understanding. I believe the Court has a better understanding.

What we want is a clear accounting of all those $8,000 payments. If you look at the schedule we submitted, we have made an attempt to show where the $8,000 was credited. Your transcript, or the Service's transcripts, do not account for these $8,000 payments.

I think the Court said it well. If the Plaintiff taxpayer made the payments, they have the right to know how they were applied. I mean, if they were applied erroneously, we could always challenge that. But at this point we're deficient. We don't even know how they were applied, whether correctly or not.

And I think that all the Court is asking you is to come up with some timeline from the Service when they're going to go through all the Treasury checks. And now you have the checks, and independently the Service can go to the Service Center and look at the codes for when those checks were negotiated. And reconstruct transcripts that will accurately take into account the $8,000 payments.

And then we can come back to the Court, if

we need to, and explain okay, based upon now a true accounting of all those checks, there is or is not a deficiency. And if there is, as I say, we're going to make the Treasury whole. If there is not, and there is an overpayment, we would expect the Treasury to do the proper thing in giving an overpayment, assuming we can resolve the penalty aspects.

So I think, in short, I adopt what the Court said. Just account for all those $8,000 payments. Have the Service go back and run new transcripts. But before they do that, look at the checks. Confirm, you know, the coding, and then construct the transcripts. And I think that will solve the problem.

THE COURT: Well, if you look at the, just if we focus on just the four checks that were attached to the supplemental, your supplemental opposition, those four checks credited to 1998 for J. Cardenas and 1995 for J. Cardenas & Sons, I find those checks on the transcripts for those years.

MR. SCHAINBAUM: And but there was no balance due. I think what the Court has observed is that there is more than those four checks, and we have supplied you the universe of those checks. And so you've probably well aware that if there is an overpayment, it means that there really isn't any tax

due and owing.

I mean, if there's tax due and owing for another period or another kind of tax, the Treasury, the Service has the right of offset. And in order to come to a real conclusion here, we have to know the universe.

We say there is nothing due on taxes for anything, and if anything, it's the penalty that's involved. But you can't get there without an accurate transcript.

THE COURT: Well, when we're looking at the materials submitted that were Plaintiffs' opposition, the two certificate of assessments that we referred to earlier, there is no indication of any balance due. And we are talking about the payments involved, and subsequent payments, without any idea of whether we are in a situation where the payments have been applied to outstanding balances due. So that's a fair assessment of these transcripts.

We wouldn't have even needed the supplemental briefing if they disclosed the answers to these questions, you know, on their face, which they probably should have. And all these documents come from Plaintiffs.

What the government submitted, as I said, in

response to my request to tie every payment in with an account balance, was not helpful at all. Again, you know, defense counsel, as a matter of fact basically it just says the amount credited per check and name on account is unknown. And only giving the date of the most recent payments, and they are in amounts that we've been talking about we received this chart.

MS. SPRIGGS: But isn't that the analysis, Your Honor? Isn't it the, you're looking at, for any refund claim, if you have a claim come in and it's not timely within three years of the return, then you're under the limitation of 6511, you've got to look at the payments?

THE COURT: Correct.

MS. SPRIGGS: So you look at what payments were made within two years of that claim, before any tax refund claim that's not timely.

THE COURT: The only problem is that because of the transcripts that we received earlier which are official, it's very unclear about the extent of balances, if any. And what we have here purports to be, it says defendant's spreadsheet. I don't know if this is, you know, taken from any official records.

But what it represents to be is the date of the last payment. And even if that, if that were

presumptively true and correct, I would say that what Plaintiff has submitted would indicate that we need to have more information. That these payment amounts and the last dates thereof are suspect. Some of these could have been totally individual $8,000 payments. None of them even look like a double. So I don't know what these amounts represent.

MS. SPRIGGS: On the transcript?

THE COURT: No, I'm talking about the most recent. The most recent document is a spreadsheet giving us the last payment due.

MS. SPRIGGS: That's when the transcript of account, that's just the last payment shown on the transcript of account, for purposes of the jurisdictional analysis.

THE COURT: Right.

MS. SPRIGGS: It's assuming that the transcript is, is correct, that there's no problem with the transcript. And I have not heard the Plaintiff explain what about the transcript, of these transcripts, would make them not --

THE COURT: Well, we don't have anything that ties in each and every payment for which we now have a check, with each and every payment in the transcript. And we have nothing in the transcripts

which gives a balance. So --

MS. SPRIGGS: The transcript, the balances that, is at the end of the transcript. It will say "balance." The very, the last page of each transcript will show the balance.

THE COURT: Okay, let's look at one.

MS. SPRIGGS: The page where it's signed by a certifying officer, that will be the last page.

THE COURT: I'm looking at, for example, Mr. Schainbaum, E-40 of your appendix, J. Cardenas & Sons, period ending December 31, 1995.

MR. SCHAINBAUM: Yes, I have that. That's the first page signed by a person named David R. Martin.

THE COURT: Correct.

MR. SCHAINBAUM: Okay.

THE COURT: And this one has one of our payments in it. It has the May 23, '06, payment noted. It looks, it correlates because it says it was received, the payment involving $8,000 was received on May 30, so we thought it correlated.

So the question would be in respect of this particular transcript, what deficiency, if any, is there in terms of knowing how the payments were made and credited?

MR. SCHAINBAUM: After the payment, they deduct interest. They charge it.

THE COURT: This is one with a zero balance I believe.

MS. SPRIGGS: Yes, Your Honor.

MR. SCHAINBAUM: That seems to have been added after there was additional interest assessed. And also, the, it says "claim disallowed."

We have never received this allowance. So I don't understand that entry at all. I understand the entry for legal suit pending, but --

THE COURT: Well, let's look at the one for J. Cardenas & Sons, December 31, 1998. Ninety-eight is not a year that Defendant challenges, so maybe we'd better pick another one.

MR. SCHAINBAUM: Sure.

THE COURT: Let's see.

MR. SCHAINBAUM: Well, I think, Your Honor, you have the right analysis. This entire universe needs to be addressed, as opposed to selecting. It will be more difficult with selection, it will be more, I think it would be easier, more efficient, to just credit or account for each of the payments.

MS. SPRIGGS: But, Your Honor, if you do look at 1998, I think you will see these $8,000

payments are being credited.

MR. SCHAINBAUM: After the payment zeroed it out and interest had been charged.

THE COURT: I'm looking now at E-48. Is that correct, that's the one I'm looking at?

MR. SCHAINBAUM: Yes.

THE COURT: And we have our two payments here, credited account on February 22, $8,000 credited on -- I'm sorry. Check dated February 22, credited February 27. Check dated March 21 in the amount of $7.976 credited March 27. These appear to be two of our payments.

And then we have on that same one, the 4/24/06 payment credited on 4/27. So what Ms. Spriggs is saying is if you read this through, you have the crediting at least involves the four payments that we have. And do we have a zero balance here?

MR. SCHAINBAUM: I believe we do, Your Honor. We also have a claim disallowed and a document locating number. And I have never seen a notice of disallowance. But afterwards, they seem to have put in a failure to pay tax penalty. I believe it comes down to a zero. Yes, it does. On E-54 it shows zero.

THE COURT: Well, am I correct that we have three records you've given us? One for Cardenas for

'98, one for Cardenas in '95, and one for Cardenas '93? I'm looking at your opposition.

MR. SCHAINBAUM: Right.

THE COURT: And so what Ms. Spriggs is saying -- I don't have any others to my knowledge -- but is saying what's wrong with the records that admittedly they're your records? But what's wrong with the records that you've shown today? What's wrong with the U.S.'s accounting? That assumes that we shouldn't have all the certificates of record for each of the years.

Are there any problems with these three years?

MR. SCHAINBAUM: The reason it's zero, they put a payment in and they zero the balance out. They charge interest but after zero.

What's wrong here is that you've got all the payments, what they call subsequent payments in here, is that a claim disallowed which we've never seen. And it comes to a zero, which is okay as an economic point of view, that nothing is owed. And based upon this, there should be no jurisdictional problem.

But the overall picture of whether or not there is any overpayment can't be compartmentalized since you have all the payments.

THE COURT: Let me ask you this. What the government says is that what they submitted was a summary from other transcripts of assessment for each of the challenged years with respect to each of the corporations, Cardenas & Sons, page 1 for the year 2000, and then the second one is Rio Vista.

When you received this document from Ms. Spriggs, did this correlate with any records that you had, whereby you could tell the amount of the payment was for the date on this corporation, whichever one of the two, the correct last payment?

For example, in 1999, which is one of our years, we have recent payments back in the year 2000, which would make the claim time-barred. And for that year, supposedly we have four payments in the amounts of -- you can read this as well as I, but -- $27,800 and some, $19,500 and some, $15,800 and some, $11,640.

Does this tally with the records that you've submitted of canceled checks for Rio Vista? I only saw two Rio Vista canceled checks.

MR. SCHAINBAUM: Well, I believe what happened, among other things, is that since J. Cardenas & Sons and Rio Vista are brother-sister organizations, they use interchangeably the checks. I think that the checks that we have utilized for the

refund claim represent what we said on the refund claim. They were payments made in 2006 to pay those companies and individuals in those companies. And there were alleged unpaid balances because Rio Vista and Cardenas kept paying the $8,000. And indeed, which I know we are putting aside for the moment, they went out and made a 6672 responsible officer assessment individuals, while these payments were in progress, kind of contrary to the 1998 Tax Reform Act and cooling down collection efforts.

So I don't understand why they did the responsible officer, but they claim, or the Service had a claim there was additional payments, or outstanding balances due which weren't being paid, which of course is not correct.

So all I can do is tell you, Your Honor, that at the time we filed the refund claims, they were within two years of those checks. And --

THE COURT: Well, given the plethora of $8,000 checks that I have, and the fact that none of the records before me tallies.

MR. SCHAINBAUM: Right.

THE COURT: I think that I'm going to ask the Service to assist Ms. Spriggs in reconciling accounts.

The payments may ultimately not have come within two years, or they might have; but at least you'll know exactly which accounts they were credited to, and what the purpose for crediting them was. Because we can't have a situation where they were credited for an account that had been paid, and any overage. And we can't have a situation where the last payments listed for these cases, according to Defendant's latest sheet, predate all of the series of checks that I'm looking at when the checks were payments for previous tax years.

That is, as Ms. Spriggs said, may not have a jurisdictional impact, and that's fine. But it's going to have an accounting impact. It has to be undertaken in any event to reconcile what's due and owing from this taxpayer.

MR. SCHAINBAUM: And I thank you for that, Your Honor. And there could be some kind of written order that Ms. Spriggs could utilize to have the Service comply or assist her in her efforts. I'd also welcome that, as well.

THE COURT: Well, I'll enter an order that indicates what should be done during the period that the parties are working together on this. But I'd like to know as soon as possible how much time the

government thinks will be required.

I think this initial meeting will be very helpful. But beyond that, and I'm hoping you'll have a representative of the IRS with you at the meeting, Ms. Spriggs, you then will need some turnaround time.

MR. SCHAINBAUM: Your Honor, in my view of things, going back to my Jurassic Park days with the Service, I think we need at least a minimum of 45 days for them to, the Treasury to collect all this information, and assemble it in a useful form.

THE COURT: Okay.

MR. SCHAINBAUM: But even 60 might be more helpful.

THE COURT: I'd like to hear how --

MR. SCHAINBAUM: I'd like to have it next week, because my clients are really hampered in their farming operations, and they have been so for many years. And they're very unhappy with me, that I haven't proceeded to bring this to closure.

THE COURT: I think that the Service and Ms. Spriggs should be heartened to hear that Plaintiffs are committing to pay taxes that the IRS says are due. Penalties will be another issue, abatement is another issue. And whether or not we have any individual penalties still at issue will be an issue. We can put

that aside.

But I do not believe that this latest filing by the government fairly represents the latest payments on older taxes due. Now, it could well be that there are tax liabilities running up to the present, and these payments have just been applied to tax years that are not covered by suit, and have nothing to do with the earlier tax periods. Of course, Plaintiff would respond and say wait a minute, you know, you certainly applied some of these to the oldest tax liabilities first; why did you stop and start applying them to more current liabilities, when for a while you purported to follow the 2005 settlement agreement, entered in 2004, but terminating in 2005? And that will be an interesting question.

I don't think this is a case of estoppel, but I'd like to see some consistency on behalf of the Service. And I don't know to what these monies were applied.

So what I'm suggesting is, Ms. Spriggs, to the extent that the Service did continue applying installment payments pursuant to the one installment agreement we have that was terminated as of September 30, 2005; if the IRS continues applying installment payments further to that agreement; we don't know for

how long, when it stopped, why it stopped. Meaning were there more current obligations to which the $8,000 payments have been applied.

Because your most recent chart does not answer satisfactorily whether what is listed here represents the last payment to the account, especially with all the unknowns. All that's recited here is the amount of payment, the date of payment, and the tax year involved.

MS. SPRIGGS: Your Honor, the amounts shown on my spreadsheet came from the certified transcript.

THE COURT: No, I appreciate that. But it still doesn't answer the question of how all these payments have been credited. We now have them all. And the fact that they obviously have not credited the oldest first. I don't even know if that 1991 is fully paid.

These amounts do not correspond to the amounts of the checks. And as far as being entitled to presumption of correctness, I think when the Plaintiff comes in and has what the government complained it lacked, which was the front and back of each check so it could identify it and correlate it with payments, that perhaps had the government had time, what I asked the government to produce could

have been produced. Plaintiff produced its half, or their half -- two corporations, their half. And the government didn't produce a correlative document.

I understand what you did produce, but I don't think it accounts for all these payments. And so that's what I'm asking you to do now. And given the circumstances that at least one of the two parties is willing to sit down, develop this information, I'm going to accept that commitment and impose it on the second. Because this should be a fairly straightforward matter.

We're not contesting the liability for the payments, but only the amounts and proper crediting of payments. Once this is done, the lion's share of the battle is over, and then the government will decide about the appropriateness and assessment of penalties.

So what I'm saying is no, this documentation is not sufficient. It's summary, that's true. But it doesn't give all the information that I requested, it doesn't correlate with Plaintiffs. And Plaintiffs have just given the government what the government was asking for, which is two sides of canceled checks, and given all that it says are relevant to the accounts in issue, which are the accounts relating to the claim years in issue.

If the government shows that these payments went for other purposes, other tax years, and that the IRS had no direction at all from Plaintiffs to apply them otherwise, and then can correlate these totals on the sheet you did give me with payments that were made, that will be fine. And we'll revive this summary judgment, I mean motion to dismiss. But I think the motion to dismiss will probably be refined on our part, once this exercise is done.

So what I'm going to do is enter an order, and ask the government to report in 45 days, and I'll give you a date certain for that. I'll ask you to report on behalf of the parties, so that you'll read whatever you're going to file to Plaintiff, and get Plaintiff's okay.

MS. SPRIGGS: Your Honor, could I ask for 60 days, since I have not talked to the Service at all?

THE COURT: That's what I feared. That's fine. I just want a report in 45 days. But if it's 60 days, I expect you to make progress as well. That's two months. So I hope you'll speak with the Service before Thursday, because I would like counsel to have a very meaningful meeting.

We've really wrestled with trying to sort these papers out. As I say, I have a chart from our

intern, who has gone through everything. We have mine that I misread, for what it's worth. But I've read these transcripts of assessment, and I do not believe that they are revelatory of outstanding balances in the two accounts when they were applied.

And hopefully, if Plaintiff concedes that Defendant is correct with respect to the last payments, and does not have an agreement that required these payments be applied to the oldest tax years for which there are deficiencies, that Plaintiffs will adjust their view of the case accordingly.

But if the situation is, as Mr. Schainbaum represents, and I think that Plaintiffs would not be wasting their time if they were aware of outstanding tax liabilities for more recent years that have not been satisfied in taking the position that these payments only related to the tax years in suit. Because that wouldn't help your client at all, right, Mr. Schainbaum?

MR. SCHAINBAUM: Well, it would be helpful in the big picture to know. I mean, I don't have any information about any contemporaneous outstanding tax liability. I think this whole problem is historical, and it needs to be solved.

But I will go back to the CPA and look into

whether or not there is any contemporaneous tax liability problems, and see whether or not any of these $8,000 payments got credited there. And I think that would be helpful both to the government and to our ourselves.

THE COURT: And when you say contemporaneous, remember we're talking about anything more recent than tax year 2002.

MR. SCHAINBAUM: Correct. That encompasses my concept of contemporaneous.

THE COURT: Okay. And if you learn of anything in that regard, it would be helpful if you could do so before your meeting.

MR. SCHAINBAUM: Right. And I'm familiar with the concept of spilloff. That's why I say in order to get an overpayment, you've got to determine whether or not there is any outstanding tax liability anywhere. And I'm certainly going to work to get our end.

So hopefully by the time I get to Washington and have the meeting, I'll have the information, yes, there is a tax liability for some other years, or no.

THE COURT: If you get any information that you believe that we should have in the short run or before the date on the order that calls for a status

report, please don't hesitate to call my law clerk, Ms. Resnick, who is assigned this case. And if we can be of any help, we would be glad to do so. But my past experience with the Tax Division is that if they see a way to resolve a matter, they spend their time doing it, and want the Court to keep its head in law books until they announce that they've given up hope.

MR. SCHAINBAUM: Right, I agree with that. I don't think that the Court necessarily should be involved. But if there is any way I think that you, the Court would be helpful in this accounting problem, I'll be happy to.

I think one way is a clear letter to the Service. And part of the problem here, as I had when I was an Assistant U.S. Attorney in the Tax Division, the Service goes to their own draw. And when it comes from the Department of Justice, they say oh, well, another, you know, department.

An order from the Court requesting getting transcripts that are all-encompassing would be helpful. And I was hopeful, Your Honor, that you would clear up about the motion to dismiss. Did you say you wanted it to be withdrawn?

THE COURT: I believe the government will withdraw it, but I'll deny it without prejudice.

MR. SCHAINBAUM: Okay. And --

THE COURT: I don't hear any volunteering to withdraw it. But I'm going to deny it without prejudice. And I will renew it if necessary, if Ms. Spriggs does the following.

She tells me that you're at a point that you can go no further, and that the Department believes that it should be revived. And I will treat it as a renewed motion. And then we will determine whether and to what extent any briefing on it has to change, in terms of what the parties have learned, so we would have a status conference. So that neither side would have to rebrief anything you've briefed before, and I could jump right on it and decide what needs to be decided.

But I have a feeling that this is going to give us a fuller picture of where the payments were made, whether they were all applied to the tax years in issue; whether there were other tax years to which the payments were applied properly, meaning there were outstanding liabilities; and whether there is an impact on Defendant's pending motion or not. And there might be.

What I'm hoping is that in the course of meeting and learning about the outstanding

liabilities, if any, if Plaintiff does pay any such amounts, it would seem the issues then would just devolve to a question of penalties.

MR. SCHAINBAUM: I agree with that analysis, Your Honor, and I look forward to a universal conclusion without burdening the Court.

THE COURT: Well, thank you very much, Mr. Schainbaum. I appreciate your sending in all this material.

I hope the record isn't confused about how I confused it. The parties did not confuse it. But I do think the transcripts of record from the IRS have not ironed the matter out.

The Court is mindful that it is the responsibility of the Plaintiffs in a case such as this to establish jurisdiction, and the burden is on them to resolve any disputed issue of fact. But when the Plaintiffs have come forward with so much as they have here, I think that they deserve to have accounting at least put in order so we can know whether installment payments were applied to the tax years that are the subject of this claim; if they were not applied, where they were applied; and whether they were applied after 2005 to the oldest tax years, in concert with the earlier installment agreement.

If at any time the Service decided to apply them to later years instead for later tax payments, I believe there is no legal doctrine that would estop the Service from doing so, but it would have to show to what years and accounts those installments were applied. In other words, in short, Plaintiffs have thrown up in the air enough canceled checks to show that the IRS has received monies; now we need to know exactly where they went.

And I'm basing a lot of this on counsel for Plaintiffs' representation that he isn't aware of outstanding tax liabilities that post-date tax year 2002. And I accept his representation as an officer of the Court.

MR. SCHAINBAUM: Right. And Your Honor, if that changes, I will inform the Court.

THE COURT: That's what we need to have, as Ms. Spriggs knows, that if you do find out that these were --

MR. SCHAINBAUM: Otherwise I renew my representation with that caveat. If I should find something out right after this conversation, since the time zone is on the West Coast, it's only 20 after one, I plan to call the CPA and have a frank discussion with him as to the status of all tax

liabilities.

THE COURT: Well, the order that I entered will not recite that representation. But that is one of the reasons we are proceeding the way we are.

MR. SCHAINBAUM: Okay.

THE COURT: So if you do find out different information that calls for different, you know, more qualified representation, by all means, let us know. And you've got to take the next step if possible, which is to say whether you believe that has an impact on Defendant's motion or not.

And you know, you're coming out here Thursday. You don't have to rush and find out everything today. Do you want us to hold off on this order until tomorrow?

MR. SCHAINBAUM: The order for, I think the order is fine. I think, to help Ms. Spriggs, if she can take that order to the Service, that would help get the ball rolling.

THE COURT: Okay, then we'll do that. Thank you both very much.

MR. SCHAINBAUM: Thank you, Your Honor.

(Whereupon, at 4:25 p.m., the hearing in the above-entitled matter was concluded.)

//

REPORTER'S CERTIFICATE

DOCKET NO.: 07-350T, 07-351T

CASE TITLE: Cardenas et al. v. U.S.

HEARING DATE: May 5, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: May 5, 2008

_______________________________

Tammy Brodsky
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018